CIT GROUP/EQUIPMENT FINANCING, INC.,
Plaintiff-Appellant,†

v.

The VILLAGE OF GERMANTOWN, Defendant-
Respondent.

Violet Joan EHRLICH, Plaintiff-Appellant,

v.

The VILLAGE OF GERMANTOWN, Defendant-
Respondent.

ARMBRUSTER BUILDERS, INC., Plaintiff-
Appellant,

v.

The VILLAGE OF GERMANTOWN, Defendant-
Respondent.

Nelson G. EVENSON and Elfrieda Evenson, Plain-
tiffs-Appellants,

v.

The VILLAGE OF GERMANTOWN, Defendant-
Respondent.

---

†Petition to review denied.

Gary J. DIVALL and Jonathan S. Ross, d/b/a Ashbury Meadows Associates, Plaintiffs-Appellants,

v.

The VILLAGE OF GERMANTOWN, Defendant-Respondent.

James A. BRUNDAHL and Bernadette Brundahl, Plaintiffs-Appellants,

v.

The VILLAGE OF GERMANTOWN, Defendant-Respondent.

Court of Appeals

*Nos. 90–1934, 90–2570. Submitted on briefs April 19, 1991.—Decided May 22, 1991.*

(Also reported in 471 N.W.2d 610.)

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *David R. Olson, Gary A. Ahrens* and *Peter R. Reckmeyer* of *Michael, Best & Friedrich* of Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Daniel L. Sargeant* and *Jerry A. Edgar* of *Schloemer, Alderson, Seefeldt & Spella, S.C.,* of West Bend.

Before Brown, Scott and Anderson, JJ.

BROWN, J.   The appellants challenge the Village of Germantown's special assessment for future users of the reserve capacity of a new sewer interceptor linking Germantown to the Milwaukee Metropolitan Sewerage District (MMSD). The issues are whether the assessment was made upon a reasonable basis, whether it stated the benefits for each assessed property pursuant to sec. 66.60(3)(d), Stats., and whether the assessment proceeds would not exceed the total cost of the project as required by sec. 66.60(11).

We affirm because we conclude that the assessment was reasonable; Germantown fulfilled the statutory requirement to state the benefits to the property owners affected by the assessment; Germantown made a reasonable projection that the total amount to be collected by the assessment will not exceed the cost of the intercep-

tor; and any funds collected beyond the total reserve capacity cost can be reimbursed to the property owners in the future.

In 1981, a regional sewerage plan adopted by the Southeastern Wisconsin Regional Planning Commission, the Wisconsin Department of Natural Resources, and the United States Environmental Protection Agency required Germantown to abandon its existing wastewater treatment plant and build a sewer interceptor connecting Germantown to MMSD. Germantown lost a lawsuit challenging this requirement. Subsequently, Germantown was under a moratorium barring any new sewer connections until it complied with the plan.

The projected cost of the total project was $22 million. Increased sewer service charges covered $12 million of the debt. The following funding plan was adopted for the remainder:

| | | |
|---|---|---|
| 1. | Wisconsin Fund Grant | $5,413,550 |
| 2. | Special Assessment of Property Adjacent to Interceptor | $275,193 |
| 3. | Reserve Capacity Assessment | $4,905,641 |

It is the reserve capacity assessment that is at issue in this appeal. However, the Wisconsin Fund Grant is relevant to the assessment.

The Wisconsin Fund Grant program was established under sec. 144.24, Stats., and is regulated by Wis. Adm. Code sec. **NR 128.** Eligible costs for the grant are the costs necessary for an interceptor having a capacity to serve only existing users. *See* Wis. Adm. Code sec. **NR 128.06(2).** Any portion of the cost for a reserve capacity to serve future users cannot be covered with a grant from the fund. *See* Wis. Adm. Code sec. **NR 128.07.**

431

To determine the fundable costs, Germantown was required to determine the parallel cost ratio, which is the cost of the interceptor without a reserve capacity divided by the cost of the interceptor with a reserve capacity. *See id.* Germantown determined that the parallel cost ratio was 93.5%. This meant that 93.5% of the interceptor's cost was to serve existing users and was therefore eligible for the Wisconsin Fund's 60% funding grant.

After the grant, Germantown still needed to fund the 40% of the eligible cost not funded by the grant, the ineligible 6.5% of the cost attributed to the reserve capacity alone, and miscellaneous costs including interest. After levying a special assessment for properties adjacent to the interceptor and applying a small contingency fund to the project, Germantown passed a resolution invoking its police powers and levying the reserve capacity assessment on undeveloped property that was not connected to Germantown's sewer system by December 31, 1985.

The reserve capacity assessment plan called for postponing the collection of the assessment until the property was developed. Only when a property was actually connected to the Germantown sewer system would an exact assessment be made by calculating the number of residential equivalency connections (REC) for the property. The REC calculation would adjust commercial and industrial development to an equivalent residential use based on the average water consumption of a single family home.

The assessment plan called for charging each REC $1000, subject to certain deductions, plus interest of 7% per year. To arrive at this amount for each future REC's assessment, Germantown projected a moderate growth rate of 125 RECs per year for twenty-seven years, even though the interceptor was designed to deal with an even

greater growth rate. The assumption of the moderate rate was based on recent growth trends and reduced population projections for southeastern Wisconsin.

The appellants are property owners affected by the reserve capacity assessment. They argue that the assessment is unreasonable, arbitrary and inequitable because it is designed to collect almost $5 million, although Germantown's parallel cost ratio in the Wisconsin Fund Grant application attributed only $614,994.26 to the reserve capacity cost of the interceptor. The appellants also argue that Germantown underestimated the annual growth rate for RECs and thus Germantown actually will collect over $8 million from the assessment rather than only $5 million.

Additionally, the appellants argue that the assessment violates the procedural requirements of sec. 66.60(3)(d) and (11), Stats., because Germantown did not assign a known amount to be collected from each parcel of property and thus could not show that the property would be benefited or that the assessment would not exceed the total cost of the interceptor's reserve capacity. In connection with their other arguments, the appellants also contend that the assessment constitutes a taking of property and a denial of equal protection in violation of the Wisconsin Constitution and the United States Constitution.

Section 66.60(1), Stats., authorizes a municipality to exercise its police power to make special assessments upon a reasonable basis. The police power of a municipality is broad and, in general, the courts may intercede only when the exercise of that power is clearly unreasonable. *Peterson v. City of New Berlin,* 154 Wis. 2d 365, 370, 453 N.W.2d 177, 180 (Ct. App. 1990). Whether an

assessment fulfills the legal standard of reasonableness is a question of law which we review *de novo. Id.*

We first address the issue whether it was reasonable for Germantown to use the reserve capacity assessment to collect almost $5 million from future users even though Germantown indicated in its application for the Wisconsin Fund Grant that the cost attributed to the reserve capacity was only $614,944.26. To understand the difference between the engineering formula used for the grant and the funding formula used for the assessment, it is helpful to picture the cost for future users and the cost for existing users as two concentric circles. The total cost of the interceptor with a reserve capacity for future users is a large circle, while the cost for the interceptor with a capacity to serve only existing users is a smaller circle covering 93.5% of the area inside the large circle.

The reserve capacity costs that were ineligible for the grant is the narrow area between the circumference of the two circles. This area represents the 6.5% difference in cost between the sewer project with an oversized pipe that could accommodate future property development and a regular-sized pipe that would serve only existing users. The grant would not pay for the oversized portion of the pipe that was clearly for future users. However, the 93.5% costs represented by the smaller circle served future users as well as existing users. Yet, the fund's parallel cost ratio formula did not require Germantown to allocate costs in the smaller circle between existing users and future users for funding purposes. That clearly would be impossible since the costs in the smaller circle are constant whether or not there is a reserve capacity built into the system for future users.

It is clear that the narrow area between the two circles does not represent the whole cost of the reserve

capacity. Rather, the total reserve capacity cost is represented by the entire area inside the large circle, including all of the area bounded by the smaller circle. Thus, the 40% of the small circle's costs that remained after the 60% grant were costs attributable to future users as well as to existing users. In fact, the future users also benefited from the grant's 60% funding of the costs of the existing users, since the future users shared in those costs and would have had to pay for them if the grant had not funded them.

When Germantown levied its reserve capacity assessment, it was not concerned with allocating costs according to an engineering formula but according to a formula that fairly and equitably distributed costs in relation to benefits. To require existing users to pay for 100% of the costs within the smaller circle and assess future users only for the costs in the narrow area between the two circles would be grossly disproportionate and inequitable. We conclude that it was reasonable for Germantown to assign to future users the 40% unfunded costs in the smaller circle along with the miscellaneous costs and the 6.5% costs clearly attributable to the reserve capacity. It was also equitable for Germantown to decide that existing users already paid their fair share of the costs through the 60% funding grant, through increased sewer charges, and through the sewer service charges and reserve capacity fee payments they made for the previous wastewater treatment facility and collector system. The previous system remained in use after the interceptor's connection to MMSD, except for the treatment plant itself.

The appellants argue that Germantown did not meet the procedural requirements of sec. 66.60(3)(d),

435

Stats. When a municipality proceeds under its police power to levy a special assessment, sec. 66.60(3)(d) requires a "statement that the property against which the assessments are proposed is benefited." We conclude that Germantown met this statutory requirement because the director of public works explicitly included a statement of benefits in his "Special Assessment Report" dated January 21, 1988. This was sufficient because all that is required is that the property assessed is benefited to some extent. *See Village of Egg Harbor v. Mariner Group, Inc.,* 156 Wis. 2d 568, 572, 457 N.W.2d 519, 521 (Ct. App. 1990). The village need not show that the value of the benefits is equal to the assessment. *Id.*

Additionally, here it is obvious that the future users were benefited by the assessment because they could not be connected to sewer service without the interceptor. There was a moratorium on new sewer connections in Germantown until Germantown complied with the DNR order to build an interceptor to connect to MMSD. Future users, not existing users, were the ones hurt by that moratorium.

There is also a requirement in sec. 66.60(3)(d), Stats., that a municipality make a list of the proposed assessments. The appellants claim that Germantown did not fulfill this requirement because Germantown listed the proposed assessment as "unknown" for almost all the properties affected by the reserve capacity assessment. The appellants claim that the statute requires a *known* proposed assessment for each property affected. We disagree.

The method of assessment may involve a variety of different alternatives. *Village of Egg Harbor,* 156 Wis. 2d at 572, 457 N.W.2d at 521. The only requirement is that

436

the method of assessment be reasonable under the existing circumstances. *Id.* Reasonableness requires that the assessment be made to fairly apportion the cost and may not arbitrarily or capriciously burden any group of property owners. *Id.* at 573, 457 N.W.2d at 521–22. We conclude that Germantown's proposed REC calculations will fairly apportion the cost of the interceptor's reserve capacity. Each REC calculation will use average residential consumption as the common standard of measurement. Moreover, the RECs will not be calculated and payments on the assessments will not be due until a property is actually developed.

The appellants argue that the assessment violates sec. 66.60(11), Stats., because Germantown will collect more than $8 million through the reserve capacity assessment, while the cost to be funded by the assessment is under $5 million. This is another variation on the appellants' general theme of disagreement with the REC method of calculating individual assessments. The appellants project the maximum number of RECs possible, whereas Germantown based its projections on a moderate growth rate for the area. We conclude that Germantown's moderate projections were reasonable. Moreover, if Germantown's projections prove too conservative and the amount collected by the assessment exceeds the cost of the interceptor's reserve capacity, Germantown can reduce the assessment and reimburse property owners who have already paid more than the amended assessment.

Because the assessments were reasonable and fulfill the statutory requirements for an assessment where a municipality proceeds under its police power, there was no taking of property in violation of the Wisconsin Con-

stitution or the United States Constitution. Neither was there a violation of the constitutional equal protection clauses since all future users were similarly treated by the assessment and the assessment had a rational basis.

The appellants argue that this case should be remanded for a new trial because Judge Merriam simply adopted Germantown's trial brief as the court's findings of fact and conclusions of law since the case concluded shortly before his retirement and he did not have time to issue a more lengthy opinion. His judgment was affirmed by an order of Judge Waddick denying the appellants' posttrial motions seeking a new trial and amended or additional findings of fact and conclusions of law. We conclude that Judge Merriam's adoption of Germantown's trial brief met the requirements of sec. 805.17(2), Stats., for actions tried to the court without a jury.

*By the Court.*—Judgment and order affirmed.